# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-1572V
### Filed: November 17, 2023

| | |
|---|---|
| LEE MEAGHER, | Special Master Horner |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for petitioner.*
*Alexis B. Babcock, U.S. Department of Justice, Washington, DC, for respondent.*

### Decision Awarding Damages[1]

On October 10, 2018, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.* ("Vaccine Act").[2]  (ECF No. 1.)  Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine that she received on October 15, 2015.  (*Id.*)  On February 23, 2023, I issued a decision finding that petitioner was entitled to compensation for her SIRVA.  (ECF No. 69.)  For the reasons discussed below, I now find that petitioner is entitled to compensation in the amount of $91,207.00, representing $90,000.00 in pain and suffering damages and $1,207.00 in past unreimbursed expenses.

## I.    Procedural History

Petitioner's case was initially assigned to the court's Special Processing Unit ("SPU"), a program "designed to expedite the processing of claims that historically have

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

been resolved without extensive ligation." (ECF No. 9, p. 1.) The parties attempted informal resolution but reached an impasse. (ECF Nos. 27, 44.) Respondent then filed his Rule 4 report on September 14, 2020. (ECF No. 45.) Respondent claimed that petitioner had not establish a SIRVA table claim because "[t]he current record does not establish that petitioner suffered SIRVA pain within [48] hours of receiving a flu vaccine on October 15, 2015, and it does not establish that her complaints of pain were limited to her right shoulder." (*Id.* at 9.)

The Chief Special Master issued a Finding of Fact on February 9, 2021. (ECF No. 51.) The Chief Special Master found that "there [was] preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of the October 15, 2015 vaccination." (*Id.* at 7.) Thereafter, the case was transferred out of SPU and reassigned to another special master in March of 2021, before later being reassigned to the undersigned on February 1, 2023. (*Id.*; ECF Nos. 52-53, 65.) While the case was pending before the other special master, the parties briefed the issue of entitlement to compensation. (ECF Nos. 62-63.)

On February 23, 2023, the undersigned filed a Ruling on Entitlement finding that petitioner "has preponderantly established that her injury meets all the QAI requirements for a Table SIRVA and that the onset of her injury occurred within the requisite period required by the Vaccine Injury Table." (*Id.* at 8.) On the same day, the undersigned filed an order confirming that the case was in the damages phase. (ECF No. 69, p. 1.) The parties filed a joint status report on March 27, 2023, confirming that all the documentation relevant to a determination of damages had been submitted. (ECF No. 71.)

On April 26, 2023, petitioner filed a Memorandum in Support of Damages. (ECF No. 72.) The next day, petitioner filed a supplemental affidavit. (ECF No. 73.) Respondent filed his Responsive Brief on Damages on May 23, 2023. (ECF No. 75.) Petitioner filed her reply on June 7, 2023. (ECF No. 76.)

Based on all of the above, I have concluded that the parties have had a full and fair opportunity to develop the record and that it is appropriate to resolve damages on the existing record. S*ee Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (citing *Simanski v. Sec'y of Health & Human Servs*., 671 F.3d 1368, 1385 (Fed. Cir. 2012); *Jay v. Sec'y of Dept. of Health & Human Servs*., 998 F.2d 979, 983 (Fed. Cir. 1993)); *see also* Vaccine Rule 8(d); Vaccine Rule 3(b)(2). Accordingly, petitioner's motion is now ripe for a ruling.

## II. Factual History

### a. Medical Records

Before receiving the flu vaccine at issue, petitioner was relatively healthy. She attended regular physical examinations, annual OB/GYN appointments, and dermatology examinations; she also underwent regular colonoscopies. (Ex. 2, pp. 1, 5, 9; Ex. 3, pp. 10, 35; Ex. 4, pp. 2, 10, 14, 17, 20; Ex. 11, p. 1; Ex. 18, p. 8.) Petitioner received her flu vaccine on October 15, 2015 at Brigham and Women's Hospital, where she worked. (Ex. 1, p. 1; Ex. 3, p. 17.)

2

On November 12, 2015, petitioner saw a nurse practitioner ("NP"), Marybeth Baker, after twisting her right ankle and was diagnosed with an ankle sprain. (Ex. 3, pp. 23-24.) Petitioner was seen by her primary care physician, Dr. Kristy Cahill, on December 24, 2015, for a routine physical examination. (*Id.* at 18.) In an addendum to the notes for this appointment, Dr. Cahill noted that petitioner mentioned her right shoulder "was sore and had been since receiving her flu vaccine in her right arm in October 2015." (*Id.* at 17.) Dr. Cahill suggested physical therapy and recommended that petitioner discuss her injury with occupational health services at Brigham and Women's Hospital given that she received her flu shot "at work." (*Id.*; Ex. 12, p. 2.)

On January 5, 2016, petitioner followed Dr. Cahill's advice and went to Brigham and Women's Hospital to seek treatment for her right arm pain. (Ex. 12, p. 3.) She was seen by a nurse practitioner, Elaine Arnold, and reported the date of injury as her date of vaccination (October 15, 2015) and the date of symptom onset as the following day (October 16, 2015). (*Id.*) NP Arnold found "no asymmetry, atrophy of the muscles around the shoulder, or a difference in the scapular winging," as well as "no swelling erythema, or increased warmth." (*Id.* at 4.) NP Arnold did note "tenderness on palpation at the deltoid, anterior shoulder." (*Id.*) She diagnosed petitioner with a "rotator cuff injury on the right." (*Id.*) At this appointment, petitioner reported her pain as a 5 to 8 out of 10. (*Id.* at 3.) NP Arnold referred petitioner to physical therapy. (Ex. 6, p. 6.) Petitioner then saw a physical therapist ("PT"), Mary Ann Covelle, on January 28, 2016. (*Id.* at 2.) Petitioner had pain, reduced strength, and reduced range of motion. (*Id.* at 4.) PT Covelle recommended a treatment plan of physical therapy two times a week for eight weeks. (*Id.* at 5.) However, petitioner did not return for subsequent treatments because coverage was denied by workers' compensation. (*Id.* at 1; Ex. 19, p. 4.)

On March 31, 2016, petitioner saw Dr. Cahill for a follow up on her right shoulder pain. (Ex. 3, p. 13.) Petitioner described her appointment at Brigham and Women's Hospital and her inability to continue with physical therapy due to the workers' compensation issue. (*Id.*) Dr. Cahill recommended petitioner undergo physical therapy to avoid frozen shoulder. (*Id.* at 14.)

On June 14, 2016, petitioner underwent thermogram of her upper body due to her right shoulder pain. (Ex 7, p. 1.) Petitioner described how her arm began to ache on October 16, 2015, following a flu vaccine that she received on October 15, 2015. (*Id.*) She explained that her pain radiated down her right arm. (*Id.*) She stated that she found it difficult to sleep and noted that "movements like using a computer mouse/reaching behind her are very difficult/with increased pain." (*Id.*)

On July 25, 2016, petitioner began physical therapy with PT Colleen Giansiracusa. (Ex. 8, p. 1.) PT Giansiracusa noted that petitioner "presented with signs and symptoms consistent with increased shoulder pain following reception of a vaccination." (*Id.* at 2.) PT Giansiracusa performed a functional assessment and "identified decreased strength, range of motion, and postural deficits." (*Id.*) Petitioner described her experience to PT Giansiracusa and noted "increased pain while performing computer tasks/specifically using the mouse. Increased shoulder pain with driving, tends to splint [right] arm." (*Id.* at 1.) In addition, petitioner stated that she

cannot reach behind her and put on clothing without pain, and she described sleeping as "uncomfortable." (*Id.*)  Although petitioner described her pain as a 2 out of 10, she denied that the pain continued to radiate or that she experienced tingling and numbness. (*Id.*)  PT Giansiracusa recommended physical therapy two times a week for eight weeks. (*Id.* at 2.)  Petitioner continued her treatment with PT Giansiracusa on July 27, 2016. (*Id.* at 3.)  She reported increased pain and soreness, which she described as being a 4 out of 10. (*Id.*)  She further reported that, while driving, her pain radiated down her arm to the elbow. (*Id.*)

Petitioner attended eight physical therapy sessions with either PT Giansiracusa or PT Heather Waters throughout the month of August 2016. (*Id.* at 4-14.)  Throughout this time, petitioner's pain fluctuated between a 1 and 5 out of 10. (*Id.*)  On August 1, 2016, petitioner reported a pain level of 4 out of 10 and described a "dull ache since starting therapy." (*Id.* at 4.)  On August 3, 2016, petitioner's pain level remained the same, but she reported feeling "better after [her] last session." (*Id.* at 5.)  On August 8, 2016, petitioner's pain level remained consistent at 4 out of10. (*Id.* at 6.)  She reported that her arm was achy "down to about the elbow" and that one of her at home exercises made her sore. (*Id.*)  During petitioner's August 10, 2016 appointment, petitioner reported an increase in pain to 5 out of 10, an aching pain "below the level of her elbow," and some tingling in her right hand. (*Id.* at 8.)  Petitioner's pain level remained at a 5 out of 10 during her August 12, 2016 appointment; however, she reported less aching. (*Id.* at 9.)  After this appointment, petitioner's pain continued to improve, and during her August 22, 2016 appointment, she reported a pain level of 1 out of 10. (*Id.* at 10.)

On August 25, 2016, petitioner had a re-evaluation appointment with PT Giansiracusa. (*Id.* at 11.)  PT Giansiracusa noted that petitioner's range of motion and strength had increased, and her pain had decreased. (*Id.* at 11-12.)  Petitioner reported that she was able to drive without pain, but "her arm fatigues quickly and aches occasionally." (*Id.* at 11.)  PT Giansiracusa recommended that petitioner continue physical therapy. (*Id.* at 12-13.)  Petitioner saw PT Giansiracusa once more in August 2016. (*Id.* at 14.)  At her August 31, 2023 appointment, she reported her pain as "less than a 1," but she continued to report soreness that transitioned into pain at a 1 out of 10 "with certain movements, like using a mouse or when sanitizing equipment at work." (*Id.*)  Petitioner did report overall improvement and "significantly less aching to the elbow." (*Id.*)

Petitioner attended nine physical therapy sessions in September 2016. (*Id.* at 15-31.)  At her September 1, 2016 appointment, petitioner reported her pain as a 0 out of 10; however, she continued to experience pain with certain movements. (*Id.* at 15.)  PT Giansiracusa reported that petitioner completed her physical therapy appointment but fatigued easily. (*Id.* at 15-16.)  Petitioner next reported to physical therapy on September 7, 2016, and she noted her pain was a 1 out of 10. (*Id.* at 17.)  PT Giansiracusa noted that petitioner continued "to report achy sensation with functional reaching" and weakness in the arm. (*Id.* at 17-18.)  During her September 9, 2016 appointment, petitioner reported her pain as a 1 out of 10. (*Id.* at 19.)  She further described how she was having trouble reaching and how performing certain activities, such as using a mouse, increased her pain and mad her arm feel "heavy." (*Id.*)  Petitioner had another appointment on September 12, 2016, during which she reported

her pain as a 0 out of 10, but she experienced pain when "managing laundry at work
[and] reaching overhead." (*Id.* at 21.)  PT Giansiracusa noted that petitioner "fatigued
quickly with reaching tasks." (*Id.*)  On September 14, 2016, petitioner reported her pain
as a 1 out of 10 and explained that "she had increased pain and achiness down to the
[right] elbow" after her previous appointment and she had trouble lifting at work. (*Id.* at
23.)  While petitioner reported improvement during her appointment on September 19,
2016, her pain continued at a 1 out of 10 and aching continued down her right arm. (*Id.*
at 25.)

On September 21, 2016, petitioner underwent another re-evaluation with PT
Giansiracusa. (*Id.* at 27.)  Petitioner noted neck and lower back soreness in addition to
her right arm pain, which had returned. (*Id.*)  She further described her pain as an ache
that was "not as severe as when she began therapy" but that had continued "on a
regular basis." (*Id.*)  PT Giansiracusa again recommended that petitioner continue
physical therapy. (*Id.* at 29.)  At her next appointment on September 23, 2016,
petitioner reported her pain as a 1 out of 10. (*Id.* at 30.)  On September 28, 2016,
petitioner again reported her pain as a 1 out of 10. (*Id.* at 31.)

Petitioner attended nine physical therapy sessions in October 2016. (*Id.* at 32-
42.)  On October 3, 2016, petitioner reported her pain as a 1 out of 10 and continued to
describe "achiness to her elbow." (*Id.* at 32.)  Petitioner's pain remained consistent at a
1 out of 10 at her next appointment on October 5, 2016. (*Id.* at 33.)  On October 11,
2016, petitioner's pain had increased to a 3 out of 10. (*Id.* at 34.)  At this appointment,
she reported increased pain after working and observed "a lot of crunching and
cracking" while performing her home exercise program. (*Id.*)  Petitioner again attended
physical therapy the next day and, while petitioner reported "some soreness about the
shoulder," she noted that her pain had decreased to a 1 out of 10. (*Id.* at 35.)
Petitioner's pain continued at a 1 out of 10 at her October 17, 2016 appointment. (*Id.* at
36.)

On October 19, 2016, petitioner underwent another re-evaluation. (*Id.* at 37.)
She reported pain at a 1 out of 10 because she could "feel" her arm but her pain was
"not too bad." (*Id.*)  PT Giansiracusa noted that petitioner had made consistent
progress in pain levels, strength, and functional use of her right arm, and she
encouraged petitioner to continue physical therapy to see additional improvement. (*Id.*
at 38.)  Petitioner was seen for her next appointment on October 24, 2016. (*Id.* at 40.)
Petitioner reported her pain continued at 1 out of 10; however, her pain had increased
to a 3 out of 10 following work. (*Id.*)  PT Giansiracusa noted that petitioner also
reported lower back pain and suggested that "postural alignment" would help improve
both her back and shoulder pain. (*Id.*)  On October 28, 2016, petitioner again described
her pain as a 1 out of 10. (*Id.* at 41.)  At this appointment, petitioner reported soreness
specifically in her right shoulder and neck. (*Id.*)  Petitioner's treatment continued on
October 31, 2016, where she again reported her pain as a 1 out of 10 and soreness in
her shoulder and neck. (*Id.* at 42.)

Petitioner attended five physical therapy sessions in November 2016. (*Id.* at 43-
49.)  During her November 2, 2016 appointment, petitioner reported her pain as 1 out of
10 and described "mild heaviness" while driving. (*Id.* at 43.)  On November 7, 2016,

petitioner reported that she had no pain on arrival; however, she described "mild heaviness" after working.  (*Id.* at 44.)

Petitioner was seen for a re-evaluation on November 14, 2016.  (*Id.* at 45.)  She reported that she "continues to have mild pain [that] comes and goes, but overall feels improvement."  (*Id.*)  Although she reported favoring her right arm, petitioner also stated that her ache was "less frequent."  (*Id.*)  PT Giansiracusa described petitioner's strength and functional use as increasing and her pain as decreasing.  (*Id.* at 46.)  However, PT Giansiracusa suggested that petitioner continue physical therapy as she remained "mildly below previous functional level."  (*Id.*)  On November 21, 2016, petitioner described her pain as a 2 out of 10 and explained that her increased pain was likely due to working all weekend.  (*Id.* at 48.)  During her November 30, 2016 appointment, petitioner reported her pain as a 3 out of 10.  (*Id.* at 49.)  She explained that her "arm has been sore again following her work shift.  It had been feeling good until it was challenged again, and the pain returned."  (*Id.*)

Petitioner attended three physical therapy sessions in December 2016.  (*Id.* at 50-54.)  On December 7, 2016, petitioner reported her pain as a 2 out of 10 and noted that the pain in her shoulder had returned after performing house chores.  (*Id.* at 50.)  PT Giansiracusa described that petitioner had increased fatigue in her shoulder.  (*Id.*)  At her December 14, 2016 appointment, petitioner reported that her pain level continued at a 2 out of 10.  (*Id.* at 51.)  On December 21, 2016, petitioner underwent another re-evaluation.  (*Id.* at 52.)  On top of her report of back soreness, petitioner described her shoulder pain as being a 1 out of 10, as no longer radiating, and as transitioning into "[m]ild discomfort while driving."  (*Id.*)

On January 4, 2017, petitioner saw Dr. Cahill for a complete physical examination.  (Ex. 3, p. 6.)  Dr. Cahill referred petitioner to an orthopedist, Dr. Johnathan Perryman, for further evaluation of her shoulder given that her pain continues more than one year after her vaccination despite physical therapy.  (*Id.* at 8.)

Petitioner continued to attend physical therapy appointments throughout the rest of January 2017.  (Ex. 8, pp. 55-59.)  On January 6, 2017, petitioner reported her pain as a 2 out of 10 and mentioned that she had been referred to a shoulder specialist.  (*Id.* at 55.)  On January 11, 2017, petitioner reported her pain as a 1 out of 10 and described her arm as "very achy."  (*Id.* at 56.)  Petitioner had a re-evaluation appointment on January 18, 2017, during which she noted an "80% improvement overall," despite continued pain with some activities.  (*Id.* at 57.)

On January 24, 2017, petitioner had her first appointment with Dr. Perryman.  (Ex. 9, p. 8.)  At this appointment, petitioner reported her pain as a 2 out of 10, but it was "aggravated by internal rotation."  (*Id.*)  Dr. Perryman explained that petitioner's shoulder pain began following her flu shot on October 15, 2016.  (*Id.*)  She further stated that she attended physical therapy for several months "with no improvement."  (*Id.*)  Dr. Perryman ordered an MRI, and petitioner underwent this MRI on January 24, 2017.  (*Id.* at 12; Ex. 3, p. 45.)  Petitioner's MRI showed "[t]endinopathy with at least high-grade partial-thickness undersurface tearing involving the mid fibers of the distal supraspinatus tendon.  A full-thickness perforation cannot be excluded.  There is no associated tendon retraction or muscular atrophy."  (Ex. 3, pp. 45-46.)  On February 1,

2017, petitioner saw Dr. Perryman to review her MRI.  (Ex. 9, p. 6.)  During this appointment, Dr. Perryman recommended a subacromial cortisone injection, which petitioner received that same day.  (*Id.* at 6-7.)

Petitioner saw Dr. Perryman for another follow up appointment on February 14, 2017.  (*Id.* at 4.)  Because petitioner reported that she did not experience much relief from the subacromial cortisone injection,  Dr. Perryman recommended an intra-articular cortisone injection.  (*Id.*)  Petitioner also reported feeling pain in her left arm that she believed was "related to her using that side more now that the right shoulder has been bothering her." (*Id.*)  Dr. Perryman administered a subacromial cortisone injection into petitioner's left arm to relieve this pain.  (*Id.* at 5.)  On March 22, 2017, petitioner underwent a complete diagnostic right shoulder ultrasound and a fluoroscopic guided injection into the right glenohumeral joint.  (Ex. 3, p. 41.)  Petitioner described her pre-procedure pain as a 2 out of 10 and her post-procedure pain as a 1 out of 10.  (*Id.* at 42.)

On April 13, 2017, petitioner went to the hospital because she slammed her right hand in a car door.  (Ex. 10, p. 65.)  Petitioner received an x-ray, which confirmed a fracture.  (*Id.* at 76; Ex. 3, p. 40.)  In August 2017, petitioner reported a flare up in her pre-existing lower back pain.  (Ex. 9, p. 2.)  On August 3, 2017, petitioner received an x-ray that revealed "mild degenerative changes of the lumbar spine and sacroiliac joints." (Ex. 3, p. 39.)

In November 2017, petitioner returned to physical therapy for her lower back pain.  (Ex. 8, p. 60-69.)  On November 15, 2017, petitioner saw physical therapist Colleen Davis and described her chronic back, which had been "off and on . . . for many years."  (*Id.* at 60.)  In addition, petitioner reported "achiness" in her right hip.  (*Id.* at 61.) Petitioner saw PT Davis again on November 17, November 20, November 22, and November 29, 2017, to treat her back and hip pain.  (*Id.* at 62-69.)

On November 30, 2017, petitioner returned for another fluoroscopic guided injection for her "right shoulder injury related to vaccine administration (SIRVA)."  (Ex. 3, 38; Ex. 13, p. 5.)  At her December 1, 2017 physical therapy appointment for her back and hip pain, petitioner mentioned that she was also experiencing pain in her shoulder; however, the record does not specify which shoulder was in pain.  (Ex. 16, p. 1.) Petitioner continued to attend physical therapy for her back and hip pain throughout the month of December 2017.  (*Id.* at 3-20.)

Petitioner returned to see Dr. Perryman on December 14, 2017, for an "evaluation of both shoulders."  (Ex. 13, p. 1.)  Dr. Perryman recommended "wait[ing] and see[ing] how her right shoulder responds to the intra-articular injection" that was administered on November 30, 2017.  (*Id.* at 2.)  In addition, Dr. Perryman recommended an MRI of petitioner's left shoulder.  (*Id.*)  Petitioner underwent an MRI on December 18, 2017, which showed a "[m]oderate grade, partial-thickness tear at the posterior interval of the distal supraspinatus" and "[m]ild acromioclavicular joint osteoarthritis."  (*Id.* at 3.)

On December 18, 2018, petitioner saw Dr. Perryman for an evaluation of her right knee after she fell.  (Ex. 17, p. 11.)  Dr. Perryman recommended an MRI, which

petitioner underwent on January 2, 2019.  (*Id.* at 12.)  This MRI revealed an ACL tear.  (*Id.* at 5-6.)  After discussing the results with Dr. Perryman at her February 7, 2019 appointment, petitioner decided to treat her knee injury conservatively with physical therapy.  (*Id.* at 6.)  She continued to see Dr. Perryman for treatment of her knee injury until April 2019.  (Ex. 20, p. 1.)

On March 11, 2020, petitioner saw Dr. Perryman "for repeat evaluation of left shoulder pain."  (Ex. 20, p. 3; Ex. 21, p. 5.)  Dr. Perryman recommended a subacromial corticosteroid injection, which petitioner received that same day.  (Ex. 20, p. 4.)  Petitioner received a fluoroscopic guided cortisone injection into her left glenohumeral joint on July 22, 2020.  (Ex. 20, p. 5; Ex. 21, p. 9.)  On October 22, 2020, petitioner saw Dr. Perryman "for evaluation of both of her shoulders and her right knee."  (Ex. 21, p. 3.)  Based on petitioner's continued pain in her left shoulder, Dr. Perryman recommended another MRI and surgery.  (*Id.* at 3.)  Petitioner underwent an MRI on her left shoulder on October 29, 2020, which showed a "[m]oderate grade partial-thickness articular sided tear of the supraspinatus/infraspinatus tendon junction superimposed upon moderate tendinosis," "[m]ild degenerative change of the acromioclavicular joint with small undersurface osteophytes," and "[t]race fluid within the subacromial subdeltoid bursa."  (*Id.* at 7-8.)  On November 5, 2020, petitioner returned to Dr. Perryman "for evaluation of her left shoulder and her right hip."  (*Id.* at 1.)  Dr. Perryman recommended taking a "wait-and-see approach" with regards to petitioner's right hip and referred petitioner to physical therapy for her left shoulder.  (*Id.* at 1-2.)

### b. Petitioner's Affidavits

Petitioner has submitted two affidavits in this case.  (ECF Nos. 10, 73; Exs. 15, 22.)  In her first affidavit, petitioner describes herself as being "very healthy" prior to her October 15, 2015 flu vaccination.  (Ex. 15, ¶ 1.)  She describes enjoying walking, biking, camping, skiing, and snow tubing.  (*Id.*)  She states that she has worked as a CT Technologist at Brigham and Women's Hospital for over 25 years without any limitations.  (*Id.*)  Her job requires a lot of reaching, heavy lifting, and computer work.  (*Id.* ¶ 10.)

Petitioner received a flu vaccine on October 15, 2015.  (*Id.* ¶ 2.)  Petitioner states that, although her arm felt "achy and sore" later that same day, she considered this feeling to be "normal."  (*Id.* ¶ 3.)  However, she explains that this "achy, sore feeling" persisted and began radiating down her arm.  (*Id.* ¶ 4.)  Although she was "annoyed," she "did not think there could be a serious problem."  (*Id.*)  She states that she treated this pain with "heat, Ibuprofen, Biofreeze, and self-massage."  (*Id.* ¶ 5.)

In addition to the pain, petitioner describes how she "had difficulty with the range of motion in [her] right shoulder and weakness."  (*Id.* ¶ 7.)  She explains that she "was unable to pull shirts, bras or any fitted clothing down over [her] head.  [She] could not reach behind [her] while driving, as [she] often did to pass things to [her] daughter in the backseat.  Simple tasks such as wiping down counters and tables were painful . . . ."  (*Id.*)

Petitioner continued to self-treat her right shoulder.  (*Id.* ¶ 9.)  She states that she found herself guarding that side and relying more on her left arm to complete household

tasks.  (*Id.*)  She had difficulty cleaning off her car after it had snowed.  (*Id.*)  Although petitioner continued to work part-time, she primarily used her left arm as certain tasks, such as working on the computer, remained painful.  (*Id.* ¶ 10.)  She described stopping to "stretch and massage [her] arm several times throughout [her] shift to try to relieve some of the pain."  (*Id.*)

Petitioner states that she discussed her shoulder pain with her primary care physician on December 24, 2015.  (*Id.* ¶ 11.)  At that time, her physician "suggested that [she] follow up with Occupational Health because they had administered the flu vaccination."  (*Id.*)  Petitioner further explains that her physician suggested that she follow up "as soon as possible because [her physician] felt physical therapy . . . was necessary to prevent further injury."  (*Id.*)

Petitioner describes how she was "evaluated by occupational health on January 5, 2016," at which point, the nurse practitioner "gave [her] a few simple exercises to perform at home and said she would discuss it with the physician."  (*Id.* ¶ 12.)  Petitioner states that she told the nurse practitioner that "the pain was the result of [her] flu vaccine" and requested that this "incident be filed with worker's compensation."  (*Id.*)

The nurse practitioner called petitioner on January 8, 2016, to tell her that the doctor had suggested physical therapy but did not feel that her pain was "related to the flu shot."  (*Id.* ¶ 13.)  Petitioner notes that the doctor did not examine her before making this determination.  (*Id.*)  Petitioner attended physical therapy on January 28, 2016; however, worker's compensation refused to cover her treatment.  (*Id.* ¶ 14.)  Petitioner continued to try to reach out to occupational health to no avail.  (*Id.* ¶ 15.)  She eventually stopped by after her shift and was scheduled for an appointment that was eventually cancelled with direction to follow up with her primary care physician.  (*Id.*)

On March 31, 2016, petitioner saw her primary care physician and was given a referral for physical therapy.  (*Id.* ¶ 16.)  Petitioner admits she was "angry about being financially responsible for [her] treatment and did not know how [she] would afford the co-payments."  (*Id.*)  She candidly explains that these feelings led her to postpone scheduling physical therapy.  (*Id.*)

After beginning on July 25, 2016, petitioner states that she continued with physical therapy and "made slow and steady progress" until January 18, 2017.  (*Id.* ¶ 16.)  Because petitioner had not seen complete recovery to baseline, her physical therapist recommended she see an orthopedic specialist.  (*Id.*)

Petitioner saw an orthopedist on January 24, 2017, who ordered an MRI and an x-ray of her right shoulder.  (*Id.* ¶ 17.)  Petitioner states that the MRI showed a tear in her right rotator cuff and that she received a cortisone injection on February 1, 2017, which offered "little to no relief."  (*Id.* ¶¶ 17-18.)  Additionally, she explains that, at this point, she had begun to experience pain in her left shoulder as a result of overuse.  (*Id.* ¶ 18.)  Petitioner's physician recommended "a cortisone injection under fluoroscopic guidance" for her right shoulder and a cortisone shot for her left.  (*Id.*)  Although this treatment resulted in "some improvement," petitioner claims that she still experienced "pain on exertion."  (*Id.* ¶ 19.)  "By early June 2017, the constant pain returned and was progressing again."  (*Id.*)  Petitioner describes her frustration and states that she "gave

up hope of making a full recovery." (*Id.* ¶ 20.)  In the fall of 2017, she learned that her health insurance plan was set to change, with increased co-payments and higher deductibles.  (*Id.* ¶ 21.)  Therefore, she "requested a second fluoroscopic-guided cortisone injection, which was done on November 30, 2017." (*Id.*)

Petitioner states that "MRI imaging has confirmed that [she has] tears in the rotator cuffs of both [her] shoulders." (*Id.* ¶ 22.)  She explains that she still experiences pain in both shoulders and describes how she is often unable to sleep through the night due to the pain.  (*Id.*)  Petitioner states that "reaching behind [her] or overhead to perform daily tasks continues to be problematic, as [her] range of motion is not back to 100%." (*Id.*)  She notes that she recently accepted a new position that requires "an increase in the physicality of [her] duties." (*Id.*)  She notes that she worries about an inability to perform her job functions and the resulting financial implications.  (*Id.*)

In her second affidavit, petitioner states that she has "not sought any recent treatment for either" of her shoulders. (Ex. 22, ¶ 1.)  Although her physicians recommend surgery on both her shoulders, she explains that she has "chosen to forgo surgical intervention because the results are not guaranteed and taking the time off work for recovery would result in decreased income." (*Id.*)  She describes how she still lacks "complete range of motion or full strength in [her] right shoulder." (*Id.* ¶ 2.)  She states that she "can still perform [her] normal household and work duties with appropriate modifications," but that she has recently increased her hours at work, which often irritates her shoulders.  (*Id.*)  She further explains that she still experiences "dull pain" on a daily basis, which she continues to treat with "Ibuprofen, ice, and gentle stretches and exercises that were provided to [her] during physical therapy." (*Id.*)

### III.   Party Contentions

#### a.   Petitioner's "Memorandum in Support of Damages"

Petitioner requests $1,818.94 in past unreimbursed expenses and $100,000.00 for actual pain and suffering.  (ECF No. 72, pp. 18, 27.)  Petitioner describes the claimed past unreimbursed expenses as "comprised of $1,612.00 in past expenses and $206.94 in past mileage [costs]." (*Id.* at 18.)  Along with their memo, petitioner also submitted an itemized list of both her medical expenses and mileage.  (*Id.* at Tabs A (Itemized Past Unreimbursed Expenses) and B (Itemized Past Mileage Expenses).)  In support of petitioner's request for pain and suffering damages, petitioner encourages the court to look at: (1) the severity of petitioner's injury; (2) petitioner's awareness of her injury and her emotional distress; and (3) the duration of petitioner's injury.  (*Id.* at 19-26.)

First, petitioner asserts that she "has endured a lengthy and traumatic period of pain and suffering as a result of her SIRVA." (*Id.* at 19.)  In support, petitioner summarizes both her affidavit and her medical records.  (*Id.* at 19-21.)  She describes how she believed her pain was a "typical side effect" of the vaccine and how she treated with "over the counter pain medication, Biofreeze, and self-massage." (*Id.* at 19.)  She describes how she began to experience limited range of motion and weakness that made it difficult to "dress, drive, sleep, and complete tasks at home and work." (*Id.* at 20.)  Petitioner also describes her course of treatment, which included thermal imaging,

an x-ray, an MRI, thirty-nine physical therapy sessions, a subacromial cortisone injection, and two ultrasound and fluoroscopically guided intra-articular cortisone injections. (*Id.*) Finally, petitioner explains that her right shoulder pain caused her to rely on her left shoulder, resulting in an overuse injury. (*Id.* at 21.) Petitioner describes her treatment course for the resulting left shoulder injury, which included an x-ray, an MRI, two cortisone injections, and a fluoroscopically guided intra-articular cortisone injection. (*Id.*) Petitioner continues to experience pain in her right shoulder, which she treats conservatively with an at-home exercise program. (*Id.*)

Second, petitioner describes how she was aware of her injury, as well as the pain and suffering she experienced. (*Id.* at 21-24.) Petitioner relies on both her affidavit and medical records to describe how her injury impacted her life, including how the pain resulted in difficulty dressing, driving, sleeping, and doing household chores. (*Id.* at 22-23.) She further describes how her pain would increase while she was working and affected her ability to perform her job duties. (*Id.* at 22.) In addition, petitioner describes how her pain ranged from a 2 and 8 out of 10 following her physical therapy sessions. (*Id.*)

Third, petitioner states that her care has lasted for a duration of over seven and a half years. (*Id.* at 25.) She reiterates that her treatment has included primary care visits, orthopedic specialist visits, thirty-nine physical therapy appointments, three cortisone injections into her right arm and three into her left arm, an overuse injury to her left arm, and continued participation in her home exercise physical therapy program. (*Id.*)

Petitioner argues that her requested award is reasonable in light of comparable SIRVA awards. (*Id.* at 26-27.) Specifically, petitioner cites the following reasoned decisions as reflecting comparable facts: *Hein v. Secretary of Health & Human Services,* No. 19-1943V, 2021 WL 4805232 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (awarding $93,000.00 for actual pain and suffering); and *Accetta v. Secretary of Health & Human Services,* No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) (awarding $95,000.00 for actual pain and suffering). (*Id.*)

**b. Respondent's Response**

Respondent disputes the amount petitioner requests for unreimbursable expenses, arguing that she should not be compensated for expenses related to petitioner's left shoulder, low back, hip, or right knee pain. (ECF No. 75, n. 2.) Respondent proposes a sum of $50,000.00 for petitioner's actual pain and suffering. (*Id.* at 9.) Respondent describes petitioner's treatment as "mild and limited" and emphasizes that "petitioner had a near two-month delay in seeking treatment, had mild to moderate pain, and received [physical therapy] and two steroid injections over the course of sixteen months, with an additional injection at about twenty-four months post-vaccination." (*Id.* at 10.) In addition, respondent contests petitioner's inclusion of her left shoulder injury in her damages award, arguing that "petitioner's word alone is legally insufficient to bootstrap an additional injury to her alleged right-sided SIRVA and inflate her damages award in this case." (*Id.*)

Respondent contends that petitioner's case is "factually distinguishable in important ways from the cases that she cites in support of her claim." (*Id.*)  Respondent explains that the petitioner in *Hein* experienced a course of treatment that "was more severe and longer" and the petitioner was pregnant, which was determined to be a unique circumstance.  (*Id.* at 10-11 (citing *Hien*, 2021 WL 4805232, at *4).)  According to respondent, these "unique circumstances" distinguish the *Hien* case from the instant case.  (*Id.* (citing *Winkle v. Sec'y of Health & Human Servs.,* No. 20-0485V, 2022 WL 221643, at *7 (Fed. Cl. Spec. Mstr. Jan. 11, 2022).)  Next, respondent explains that, in comparison with the instant petitioner, the petitioner in *Accetta* had both a longer treatment course, which was "anticipated to be more extensive and severe," and "unique circumstances," including a treatment course that exacerbated a pre-existing anxiety disorder.  (*Id.* at 11 (citing *Accetta,* 2021 WL 1718202, at *3).)

Respondent cites three cases that he argues "are more comparable to petitioner's injury and treatment course."  (*Id.*)  Specifically, respondent cites *Mejias v. Secretary of Health & Human Services,* No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) (awarding petitioner $45,000.00 for actual pain and suffering); *Merwitz v. Secretary of Health & Human Services,* No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Oct. 11, 2022) (awarding petitioner $50,000.00 for actual pain and suffering); and *Ramos v. Secretary of Health & Human Services,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding petitioner $40,000.00 for actual pain and suffering).  (*Id.* at 12-13.)

### c.  Petitioner's Reply

Regarding unreimbursable expenses, petitioner argues that "her left shoulder pain occurred subsequent to, and as a result of, her right SIRVA."  (ECF No. 76, pp. 2-4.)  However, regarding her 2017 physical therapy appointments, she also contends that "[a] simple review of the [physical therapy] records documents treatment for, and exercises involving, her right upper extremity."  (*Id.*)  Regarding an award for pain and suffering, petitioner reiterates her assertion that her pain was "severe."  (*Id.* at 6.)  In response to what petitioner characterizes as respondent's "conflat[ion] of duration of symptoms with duration of formal, objective treatment," petitioner clarifies that "her right SIRVA has been symptomatic for over seven and a half" years.  (*Id.* at 6-9.)  She again summarizes her "objective" treatment course, asserting that her treatment history is most similar to *Hein* and *Accetta*.  (*Id.* at 8-12.)  Petitioner contends that the cases cited by respondent are not comparable to her case as all three cases involved shorter treatment histories.  (*Id.* at 12-13.)  Petitioner also stresses that the petitioner's treatment course in *Mejias* did not include physical therapy or steroid injections.  (*Id.* at 12 (citing *Mejias,* 2021 WL 5895622).)  Similarly, petitioner notes the *Ramos* petitioner had fewer physical therapy sessions and no steroid injections.  (*Id.* (citing *Ramos,* 2021 WL 688576).)

## IV.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 300aa-15(a)(4).  Additionally, a petitioner may

recover "actual unreimbursable expenses" that were "incurred before the date of judgment awarding such expenses" and that "(i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, [and] rehabilitation . . . determined to be reasonably necessary." § 300aa-15(a)(1)(B). Finally, petitioners who have had their earning capacity adversely impacted due to their vaccine injury may receive "compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections." § 300aa-15(a)(3)(A). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (explaining that "[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) (noting that "the assessment of pain and suffering is inherently a subjective evaluation"). In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, decisions regarding prior awards, although potentially persuasive, are not binding. *See Nance v. Sec'y of Health & Human* Servs., No. 06–730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *see also Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

The majority of SIRVA cases resolve within the Special Processing Unit or "SPU" which is overseen by the Chief Special Master. In a recent decision awarding damages, the Chief Special Master explained that, as of July 1, 2023, 3,211 SIRVA cases had been compensated within the SPU since its inception in July 2014. *See Mussehl v. Sec'y of Health & Human Servs.,* No. 21-0031V, 2023 WL 5203102 (Fed. Cl. Spec. Mstr

July 12, 2023.)  Among those cases, only 173 were awarded compensation based on a reasoned decision of the special master.  *Id.*  Among the 173 decisions, the Chief Special Master has explained that the awards for actual pain and suffering have ranged from $40,757.00 to $265,034.87, with a median award of $92,299.83.  *Id.* at *3. Unsurprisingly, stipulated and proffered awards cover a much larger range—from $5,000 for the lowest stipulated amount to $1,845,047.00 for the highest proffered award.  *Id.*  Of course, these amounts are not limited to pain and suffering awards. Moreover, as the Chief Special Master observed, "even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision."  *Id.* at *2 n.8.

## V.     Analysis

### a.  Pain and Suffering

I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record.  The primary considerations informing pain and suffering in SIRVA cases are the severity and duration of the shoulder pain. Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of petitioner's reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of physical therapy, the modalities of treatment (*e.g.*, steroid injections, surgeries, etc.), the severity of the MRI or surgical findings, subjective reports of pain levels, and the ultimate prognosis.

Respondent stresses that petitioner first began complaining of pain approximately two months after she received her vaccine.  (ECF No. 75, pp. 9-10.) Prior cases have noted that a delay in seeking treatment, even while not necessarily informative regarding onset and entitlement, may nonetheless still be relevant to assessing the severity of pain and suffering.  *See, e.g.*, *Eshraghi v. Sec'y of Health & Human Servs.*, No. 19-0039V, 2021 WL 2809590, at *3 (Fed. Cl. Spec. Mstr. June 4, 2021); *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).  In this case, however, the Chief Special Master concluded that the evidence supports a finding that onset of petitioner's shoulder pain began within 48 hours of vaccination and specifically noted that "her first treatment visit with respect to the alleged injury was not egregiously long after receiving the vaccine." (ECF No. 51, p. 6.)  I subsequently adopted the Chief Special Master's analysis when I determined petitioner suffered a Table Injury of SIRVA.  (ECF No. 68, p. 5.) Accordingly, the timing of petitioner's initial treatment is not a significant factor in assessing the damages in this case.

On the whole, petitioner's course of treatment for her right shoulder injury includes thirty-nine physical therapy appointments, an MRI, one subacromial cortisone injection, and two fluoroscopic guided intra-articular cortisone injections.  (Ex. 3, pp. 38, 45; Ex. 8, pp. 1-59; Ex. 9, pp. 4, 6-7; Ex. 13, p. 5.)  Petitioner's pain fluctuated between 0 out of 10 and 8 out of 10.  (Ex. 8, pp. 8, 15.)  Although petitioner briefly mentioned

right shoulder pain in her October 22, 2020 appointment with Dr. Perryman "for evaluation of both of her shoulders and her right knee," petitioner's medical records largely suggest that her right shoulder pain resolved after November 2017.  (Ex. 21, p. 3.)  Petitioner had a therapeutic injection on November 30, 2017.  (Ex. 3, p. 38; Ex. 13, p. 5.)  Two weeks later she reported still being sore from the injection itself, but she had near normal range of motion.  At that time, Dr. Perryman still felt the therapeutic injection would ultimately offer relief.  (Ex. 13, pp. 1-2.)  This marked the end of petitioner's formal treatment of her right shoulder condition, and she largely did not mention her right shoulder in subsequent encounters despite seeking treatment for other conditions, especially her left shoulder.  In her most recent affidavit, she asserts ongoing dull pain accompanied by limitations in strength and range of motion, but she acknowledges that she has stopped seeking treatment and that her residual complaints no longer impede her activities of daily living.  (Ex. 22.)

While it is understandable petitioner would perceive her left shoulder pain as an overuse injury, there is not preponderant evidence to support that perception.  In particular, petitioner has not cited any medical opinion to support her contention.  (ECF No. 72.)  Petitioner did report her concern regarding overuse to her physician (*e.g.*, Ex. 9, pp. 4-5); however, none of petitioner's treating physicians offered that assessment themselves, and her left shoulder MRI included evidence of both tearing and degenerative changes that could otherwise explain her shoulder pain.  (Ex. 9, pp. 4-5; Ex. 13, pp. 1-4.; Ex. 20, pp. 3-4; Ex. 21, pp. 3-4, 7-8.)  Petitioner is competent to testify as to the fact of her symptoms, but not their underlying cause.[3]  *Accord James-Cornelius v. Sec'y of Health & Human Servs*., 984 F.3d 1374, 1380 (Fed. Cir. 2021) (explaining that "lay opinions as to causation or medical diagnosis may be properly categorized as mere 'subjective belief' when the witness is not competent to testify on those subjects").

Petitioner and respondent referenced a total of five cases as comparable to this petitioner's history (petitioner cites two and respondent cites three).  Petitioner urges direct comparison to two cases awarding $93,000.00 and $95,000.00 and respondent cites cases awarding between $40,000.00 and $50,000.00.  (ECF Nos. 72, 75.)

The cases cited by respondent are unhelpful in determining an award in this case.  The petitioners in all three of the cases cited by respondent had significantly fewer physical therapy sessions, had injuries of much shorter duration (even when setting aside petitioner's specific assertion that her injury persisted for over seven years), and only one of the three petitioners received a single cortisone injection.  For example, in *Miller v. Secretary of Health & Human Services*, the petitioner received three cortisone injections and underwent 25 total sessions of physical therapy and an MRI.  No.20-604V, 2022 WL 3641716, at *5 (Fed. Cl. Spec. Mstr July 22, 2022).  The petitioner in *Miller* delayed seeking treatment for over two months and had a significant gap in treatment, exceeding seven months.  *Id.*  The petitioner in *Miller* reported mild to moderate pain and "substantially recovered 17 months after her vaccination."  *Id.* at *6.  The petitioner in *Miller* was awarded $75,000.00, which is $25,000.00 more than

---

[3] Petitioner works in the medical field as a CT technologist, but she is not a medical doctor.  (Ex. 15.)

respondent's proposed award, for a shorter course of treatment, substantial delays in treatment, and significantly less physical therapy sessions.

The cases cited by petitioner are much more comparable to this case, even after accounting for respondent's objection that these cases contained extenuating circumstances not present in this case. For example, in *Hein*, the petitioner suffered fluctuations in symptoms for 27 months. 2021 WL 4805232, at *5. Ultimately, the petitioner in *Hein* received three cortisone injections and underwent ten physical therapy sessions. *Id.* In addition, the petitioner in *Hein* was pregnant at the time of her injury, and her condition was "exacerbated by the need to care for her newborn son, born approximately two months after her vaccination, and her two-year old daughter." *Id.* Based on all of these circumstances, the petitioner in *Hein* was awarded $93,000.00. *Id.* at *7. While the petitioner in the current case was not pregnant and only experienced symptoms for around 23 months, she underwent nearly four times the number of physical therapy sessions that the petitioner in *Hein* did. In the second case cited by petitioner, *Accetta,* the petitioner underwent an MRI, ten physical therapy sessions, and experienced symptoms that lasted around five years. 2021 WL 1718202, at *3-4. The *Accetta* petitioner did not receive any cortisone injections and, while surgery was recommended, she choose to forego such treatment due to a pre-existing anxiety disorder. *Id.* at *4. While the petitioner in *Accetta* experienced symptoms for far longer than the petitioner in the instant case, the petitioner in this case underwent nearly four times the amount of physical therapy sessions and received three cortisone injections.

In light of all of the above, I conclude that $90,000.00 represents a reasonable award for petitioner's pain and suffering.

### b. Past Unreimbursed Expenses

In this case, petitioner claims $1,818.94 in unreimbursed expenses for copays and mileage costs associated with medical appointments (largely physical therapy) occurring mostly between March of 2016 and December of 2017 (two encounters were in 2020). (ECF No. 72, p. 18.) These expenses are delineated and documented in an appendix to petitioner's motion labeled "Tab A"[4] and "Tab B." (ECF No. 72, pp. 32-77.) Respondent contests the expenses associated with petitioner's left shoulder, low back, hip, and right knee treatment. (ECF No. 75, n. 2.) Specifically, respondent contests expenses related to petitioner's December 18, 2017 MRI appointment and all physical therapy in 2017. (*Id.*) Petitioner argues that her left shoulder pain "occurred subsequent to, and as a result of, her right SIRVA." (ECF No. 76, p. 3.) In addition, she

---

[4] Petitioner's documentation of the claimed expenses is very confusing. Tab A includes both an itemized list of claimed expenses and a series of supporting documents, many of which are highlighted or include handwritten notes. Several of the receipts are redundant. For example, petitioner's January 24, 2017 orthopedic copay is documented twice. (ECF No. 72, pp. 35-36, 68.) Numerous $20 copays from November and December of 2017 are highlighted in the supporting documentation but not included in the itemized list of costs. Some of the dates on the itemized list do not match the dates on the corresponding documentation. Because the highlights and notations on the supporting documents are not self-explanatory, only costs specifically included in petitioner's itemized list will be considered.

argues that, while she sought treatment for her hip, back, and knee, these appointments also included "treatment for, and exercises involving, her right upper extremity." (*Id.*)

As explained above, I have concluded that petitioner has not established her left shoulder condition to be related to her right shoulder SIRVA. Thus, the $50 MRI copay dated December 18, 2017, which was for petitioner's left shoulder, will not be reimbursed. Additionally, the orthopedic copays dated December 14, 2017, March 11, 2020, and November 5, 2020, will also not be reimbursed. Although petitioner's right shoulder pain may have been addressed, the records are clear that her unrelated left shoulder pain was the primary purpose of the appointment. (Ex. 13, pp. 1-2; Ex. 20, pp. 3-4; Ex. 21, pp. 1-2.) Thus, the cost of the copay was not incurred as a result of petitioner's vaccine-related injury. *Accord Henderson v. Sec'y of Health & Human Servs.,* No. 20-1261V, 2023 WL 2728778, at *7 (Fed. Cl. Spec. Mstr. Mar. 31, 2023) (declining to reimburse costs associated with "treatment and testing initiated by Petitioner for multiple overlapping but distinct co-morbidities"); *Miles v. Sec'y of Health & Human Servs.,* No. 20-146V, 2023 WL 21155, at *9 (Fed. Cl. Spec. Mstr. Jan 3, 2023) (declining to reimburse costs for "unrelated appointments" and "prior medications"). The remainder of the claimed costs appear appropriate for reimbursement, with the exception of a $295.00 payment to Inside Out Wholistic Wellness and Thermography.[5] (ECF No. 72, p. 72.) Petitioner self-referred for this imaging (Ex. 7, p. 1); however, none of the medical records indicate that this type of imaging was recommended by petitioner's treating physicians, that the result was useful to them, or even that any of petitioner's physicians were made aware of the results.[6] (*Id.* at 2-3.) Thus, petitioner has not substantiated that this cost was "reasonably necessary" for diagnosis or care of her injury. § 300aa-15(a)(1)(A)(iii)(I).

I also conclude that petitioner's request for mileage reimbursement is not sufficiently substantiated. Petitioners may be reimbursed for travel, including mileage reimbursement when using their own vehicle. *See, e.g., Williams v. Sec'y of Health & Human Servs.,* No. 90-2239V, 1996 WL 608455, at *1 (Fed. Cl. Spec. Mstr. Oct. 10, 1996). In this case, however, petitioner's presentation is limited to her counsel's chart, appended to petitioner's brief, calculating the distance between her home and her providers' offices. (ECF No. 72, p. 75-77.) Though it would be tempting to merely assume the calculations reflect reality, the record does not include even the barest of sworn statements in petitioner's affidavits confirming that she completed these trips using her own vehicle or that each trip consisted of the type of direct roundtrip from

---

[5] Thermography is "a technique wherein an infrared camera is used to photographically portray the surface temperatures of the body, based on the self-emanating infrared radiation; sometimes employed as a means of diagnosing underlying pathologic processes, such as breast tumors." *Thermography*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=49629 (last visited Nov. 16, 2023).

[6] The report includes the following boxed warning: "This Report is intended for use by trained health providers to assist in evaluation, diagnosis, and treatment. It is not intended for use by individuals for self-evaluation or self-diagnosis. This Report does not provide a diagnosis of illness, disease or other condition. Clinical Thermology is a screening procedure subject to both false negative and false positive results. It is most reliable when a stable baseline is obtained followed by regular repetitive screening for changes. Results must be interpreted in the context of historic and current clinical information." (Ex. 7, p. 4.)

home and back as calculated. *Accord Morgan v. Sec'y of Health & Human Servs.*, No. 20-1286V, 2022 WL 4717958, at *8 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (observing the need to substantiate use of a personal vehicle and finding that, although mileage calculations may be paid in other cases, ambiguities presented by the circumstances required further explanation).

In light of all of the above, I conclude that petitioner should be reimbursed costs totaling $1,207.00.

## VI.    Conclusion

After weighing the evidence of record within the context of this Program, I find that $90,000.00 represents a reasonable and appropriate award for petitioner's actual pain and suffering and $1,207.00 represents a reasonable and appropriate award for petitioner's past unreimbursed expenses. **I thus award petitioner a lump sum payment of $91,207.00, representing compensation for actual pain and suffering and past unreimbursed expenses in the form of a check payable to petitioner.** This amount represents compensation for all damages available under Section 15(a). The Clerk of the court is directed to enter judgment in accordance with this decision. [7]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.